## NATHAN B. SPRAGUE *v.* ANTHONY STEERE.

Acquiescence in a nuisance by the party injured is a bar to a bill to re-
strain the nuisance.

Where the plaintiff, having granted a mill site and water privilege, with
power to flow his land within certain limits, permitted a dam to be raised
so high as to flow the water beyond those limits, and, afterwards, allow-
ed the dam to be repaired, at the same height, and a mill and machinery
to be adjusted to that height, the Court refused an injunction to compel
the defendant to lower his dam and restrict the flowage to the limits ex-
pressed in the grant.

THIS was a bill in equity. The complainant sets
forth, that on the 19th of September 1832, he conveyed
to Welcome Aldrich and William Wilkinson, a lot of land
for a mill site, with the privilege of building and forever
maintaining a dam across the river, on the land of the
grantor, about thirty rods above said lot, of such height
as would flow " the water as far back as the westerly
line of the grantor's land, adjoining land of Stephen
Gross and Aaron Mowry," together with other privileges;
which are stated in the opinion of the Court. That, in
pursuance of this grant, Aldrich & Wilkinson entered
into possession of the premises and constructed their
dam, which was, shortly afterwards, partly carried away
or impaired, so that the extent of their flowage was never
exactly ascertained, while they continued owners of the
privilege. That the privilege remained unoccupied and
unimproved for twelve years, until 1844, when Anthony
Steere, the defendant, purchased it of Aldrich & Wilkin-
son, with full knowledge and notice of the extent, reser-

vations and conditions of the original contract and grant to them. That in 1844 or 5, the defendant in re-building the dam, and re-constructing the waste or rolling-way, raised them in such a manner, as to occupy more land of the plaintiff, than the original dam occupied, and flowed beyond the limits prescribed in his purchase, by means of which, the wings of the dam had likewise been extended upon the land of the plaintiff on both sides of the river. That the defendant had been notified of these facts, but still persisted in maintaining his dam, at its present height. The bill prays, that the dam be lowered and the flowage restricted to the limits expressed in the grant, and, also, for remuneration for the unjust occupancy and excess of flowage.

The answer, admitting the facts in regard to his title, as stated by the plaintiff, denies that the dam of Aldrich & Wilkinson was carried away shortly after it was built, and asserts, that the repaired dam occupied no more of the plaintiffs land, that the re-constructed waste or rolling-way was no higher, and the flowage no greater, now, than they were in the first instance. He further says, that the plaintiff in 1838, under a mortgage, and Aldrich & Wilkinson, again, in 1839, advertised the privilege for sale, as having 16 1-2 feet head and fall, and, that he purchased the privilege believing it to have contained that amount of head and fall,—which was its present height,—from the beginning, and, he heard no complaint that the dam was too high, until within two years after he had adjusted his mill and machinery to the present elevation. That the dam and rolling-way were erected and pond flowed originally by Aldrich & Wilkinson, under the inspection of the plaintiff; that he himself constructed his trench and erected his mill with 16 1-2 feet

Nathan B. Sprague *v.* Anthony Steere.

head and fall under the eye of the plaintiff, with his ac-
quiescence and with a knowledge of the advertisements,
and, therefore, he claims a right to maintain the flowage
at that height, and asks that the complainants bill may
be dismissed.

The facts of this case are reviewed and discussed
at length in the opinion of the Court. Upon the points
of Law, it was contended for the defendant, that Equi-
ty will not, in all cases of this character, enjoin or
decree relief. (2 Story's Eq. Juris. p. 204.) The com-
plainant must come into Court with clean hands. He
must do equity or offer to do it. He must not, by his
own misconduct or gross negligence, have been the cause
of the grievance, which he now seeks to remedy. Courts
of Equity will regard the maxim, *de minimis non curat
lex*, so far as that for a small and inconsiderable matter,
they will not cause an innocent person to suffer great
and irreparable injury ; especially, when the small and
inconsiderable injury has resulted from any fault or laches
of the complainant or his gross negligence.

Courts of Equity cannot, it is true, presume a grant of
an interest in land, without twenty years adverse posses-
sion ; but, under peculiar circumstances, they may refuse
to enforce rights, strictly legal and technical, especially,
if manifest injustice would be the result. The complain-
ant is estopped and cannot take advantage of his own
wrong. He has, by his acts and declarations, induced the
defendant to purchase, under the belief that all was right ;
he has allowed the defendant to appropriate to himself
part of his privileges and agreed to it without complaint,
thus inducing him to invest large sums of money in
works, which would be ruined by granting the plaintiff's
request ; and, under such circumstances, the rule is clear,

that he has no equity and is not entitled to relief, at least, by injunction. (Equity cases abridged 522-3. Story's Eq. Juris. p. 269.) The authorities go even further, and say, that they will rather, under such circumstances, presume that license had been given; and inasmuch as the defendant had acted on that license and it had become executed, the plaintiff has no equity in setting up technical objections to the title against his own act, and shall not therefore be assisted in equity.

AMES and RANDALL, for the plaintiff.

CARPENTER and BROWNE, for the defendant.

The opinion of the Court was delivered by GREENE, C. J.

The plaintiff, on the 19th of September 1832, conveyed, for a valuable consideration, to Welcome Aldrich and William Wilkinson, a lot of land for a mill site; " also, the privilege of building and forever maintaining a dam across the river on the land of the grantor, at some convenient place, about thirty rods above the lot herein before conveyed, of such height as will flow the water as far back as the westerly line of the grantor's land, adjoining land of Stephen Gross and Aaron Mowry, and no farther. And, also, the privilege of using all the water of said river and of digging a canal or flume from said dam to the lot hereinbefore conveyed, through land of the grantor, at some convenient place, of sufficient dimensions for the convenient use of the aforesaid water privilege. And, also, the privilege of digging stones, if they can be conveniently obtained, and, also, gravel, from some place, near said dam on the land of the grantor, and of using the same for the purpose of building and keeping in repair the aforesaid dam and canal, free

of any charge for the same, together with the privilege, at all times, of passing and re-passing upon the land of the grantor, for the purposes of building and repairing said dam and canal." The deed contained this condition : " that the said dam and canal shall be commenced within nine months from the date of these presents, and completed within a reasonable time thereafter, otherwise this deed is void."

Aldrich & Wilkinson built the dam in the fall of 1832. The pent stock was carried away in February or March, 1833, and the pond drawn down.  In June of the same year, a new pent stock was put in, and the pond was filled and kept full so as to run over the rolling-way, until 1836, when a breach was made in the North end of the dam, and the pond was drawn down and remained so, until the dam was repaired by the defendant in 1844. The bill states, that the dam was partly carried away a short time after it was erected ; but this allegation is denied by the answer, and is not only not supported by any evidence, but is contradicted by the testimony of the plaintiff's as well as of the defendant's witnesses.

Mowry, (plaintiff's witness,) says, the dam stood about two and a half years, after it was built by Aldrich & Wilkinson, before it was partly carried away, and Aldrich, defendant's witness, says, the pond was filled, as soon as the dam was finished, and continued so, about three years, and run over the rolling-way, most of the time.

Aldrich & Wilkinson did not repair the breach, made in the dam in 1836, and the pond was drawn down and the privilege unoccupied until after the sale to the defendants in 1844.

Aldrich & Wilkinson gave to the plaintiff a mortgage deed of the premises, of the same date with the deed

to them, to secure the purchase money. The deed of mortgage contained a power of sale. Under the power in the deed of mortgage, the plaintiff advertised the premises for sale, in the Morning Courier and General Advertiser, of February 1, 1839, and continued the same until the 13th of March following.

The plaintiff, in his advertisement, describes the premises, as " a valuable water privilege, with a dam and 16 1-2 feet head and fall ;" and invites purchasers to call and examine the same. Sixteen and a half feet is the head and fall, obtained by the present height of the dam.

Aldrich states ; he thinks they advertised the premises in the Republican Herald for sale, both before and after the advertisement of the plaintiff, and their advertisement stated the head and fall to be sixteen and a half feet.

The breach in the North end of the dam, did not injure the rolling-way, not extending to within several feet of it. The length of the dam is about three hundred feet, and the rolling-way about forty feet. The premises remained in this condition, the pond drawn down and the breach in the North end of the dam being unrepaired, until March 16, 1844 ; when Aldrich & Wilkinson, for a valuable consideration, sold and conveyed the premises to the defendant.

The defendant, thereupon, proceeded to repair the breach in the North end of the dam ; also, to repair the rolling-way, by putting in plank, and, instead of putting the bulk head in the dam, put the same lower down the trench, which conducts the water to the mill. He also proceeded to erect the mill and to put the machinery therein ; the cost of all which, he states in his answer to have been about $60,000.

It is contended by the counsel for the plaintiff, that the rolling-way of the dam has been raised by the defendant to a much greater height, than that to which it was originally built.

We do not think this position is sustained by the evidence. The answer denies it, and, being responsive to the bill, is evidence, and is entitled to more weight from the fact, that the rolling-way was repaired under his, the defendant's direction. Stephen Mowry, plaintiff's witness, says, the rolling-way was not carried away, and, as far as he knows, it remains at the same height, as when originally built. This witness resides in the immediate neighborhood of the dam, and, in answer to a question by the plaintiff's counsel, states that he forms his opinion by the flow back of the water.

Richard Sweet, plaintiff's witness, worked on the dam and in the repair of the rolling-way ; and states, that his directions from the defendant were, to make the rolling-way of the same height as before ; and that it was so done. This witness can hardly be mistaken.

The plaintiff's counsel rely upon the testimony of Aldrich & Wilkinson, who, in stating the flow back at the plaintiff's West line, when the pond was first filled, do not state it to be so large as the evidence shows it to be now ; still, the counsel contend, that the testimony of these witnesses shows the flowage was beyond the plaintiff's West line.

The difference in the flow back of the water, at the West line, when the dam was first built and after the repair by the defendant, must necessarily be matters of opinion, if not measured. The extent of the flow back would be different in different states of the river, whether high or low ; and the witness, who would undertake to

judge of the relative extent of this flow, before and after the repairs, ought to examine the river at the two periods, when at the same height of water. Aldrich & Wilkinson do not state how high the water in the river was, when the pond was filled in 1832. How was this to be known, except by actual measurement of the water on the dam, at the time when the comparison is made ?

But, further, Aldrich swears positively, that the rolling-way was not raised. He says he is not positive to one quarter or one half of an inch, but if he was to do it over again, he does not know that he could get it any nearer to what it was before, than it now is. Now, the repair of the rolling-way was recent. The relative height of the old and the new planking was a matter he could hardly be mistaken about, more especially, as the directions, at the time the work was done, were to make the new planking of the rolling-way of the same height with the old ; whereas the first flow of the dam was in 1832, and a witness might well be mistaken as to the exact extent of this flow, compared with the flow of 1844, when the dam was repaired by the defendant.

Then again, there is the improbability, that the defendant, who was about to erect important works upon this dam and adjust his wheels and machinery to its height, as he repaired it, would have taken so great a peril on himself, within sight of the plaintiff's house and liable at any time to detection by him.

The plaintiff's counsel also rely upon the following facts, as evidence that the rolling-way has been raised :

When Aldrich & Wilkinson were about to sell to the defendant, they took levels from the top of the rolling-way to various points on Aaron Mowry's land, in order to ascertain how much of his land would be flowed, when

the pond was full.  Aldrich & .Wilkinson took a deed from Mowry of the land, which, according to his measurement, would be flowed, (and set up bounds thereon.)  The plaintiff's counsel contend, that more land is flowed than embraced by these levels.  But, how little reliance can be placed on these levels, (none of the persons employed in taking them appearing to be surveyors,) is shewn by the fact stated by Stephen Mowry, plaintiff's witness, that the water, when four inches on the present rolling-way did not come up to three of the bounds, while it overflowed four of them.  And it is important to observe, that Stephen Mowry, plaintiff's witness, who states these measurements and levels, swears that the rolling-way had not been raised, and says, he comes to this conclusion from the flow of the water.  This is the son of Aaron Mowry, whose land was flowed.

We think the evidence satisfactorily shows, that the dam flows the water no farther beyond the plaintiff's West line, than it did when first built.

The next question is, did the plaintiff know of this overflow beyond the line, as of his grant.  For if the plaintiff was ignorant of this fact, no inference, unfavorable to him, can be drawn from it.  Nor was the plaintiff bound to inquire.  Knowledge must be brought home to him.

Aldrich states, the plaintiff was at the dam quite a number of times, while they were building it ; and thinks he was there after it was finished.  The pond was in full view from the plaintiff's house and but a few rods from it, and the water was running over the rolling-way, for nearly three years after the dam was built, except when occasionally drawn down by use.  This overflow, beyond the plaintiff's West line, was not merely deepen-

Nathan B. Sprague *v.* Anthony Steere.

ing the water in the bed of the river at that place, but extended over and beyond the banks of the river, for several rods above the West line. Such an overflow beyond the limits of the plaintiff's grant, for such a length of time, could not escape his observation.

If the grant had been to raise the dam fifteen feet high, and the defendant had built it sixteen and a half feet high, mere inspection of the dam would not have shown him the excess ; and no knowledge on his part of the excess could have been inferred from inspection ; but the flow beyond his West line was palpable and could not escape his observation. It is to be stated, in this connection, that the bill does not state the plaintiff was ignorant of the fact, that the dam, as originally built, exceeded the limits of the grant. The bill states the dam was partly carried away and the pond drawn down, soon after it was built, so that it was never exactly ascertained to what height Aldrich & Wilkinson raised the dam, or how far the water had overflowed.

The plaintiff made no complaint to Aldrich & Wilkinson of the height of their dam, but, on the contrary, as late as February, 1839, advertised the premises for sale, under the power, contained in his mortgage from Aldrich & Wilkinson, and in this advertisement, as already stated, he describes the premises as a valuable water privilege, with a dam and sixteen and a half feet head and fall, and invites purchasers to call and examine the premises.

It does not appear, except by the answer of the defendant, that the defendant saw this advertisement, but we refer to it, as evidence of a determination on the part of the plaintiff not to disturb the dam, as it then stood. And the plaintiff had good reason for coming to such conclusion. The plaintiff was interested in the privilege,

not only to the extent of getting the purchase money by a sale of the premises, but, also, in having the privilege occupied by the erection of mills thereon. This is shewn by the condition in the deed to Aldrich & Wilkinson, by which they were bound to commence the dam, within nine months from the date thereof, and complete it, within a reasonable time thereafter. Now, if the plaintiff had informed the public in his advertisement, that the dam was too high, and must be reduced as low as he now claims to have it reduced, it would have been more difficult to have found purchasers.

And it deserves to be considered, in this connection, that the damage done to the plaintiff, by the present height of the dam, is merely land damage, of the same nature with damage which would be done by the dam, at the authorized height, and but little more in quantity. Whereas, the effect of the reduction in the value of the privilege was very great, the last foot on the top of the dam being the most valuable.

Nor does it appear, that the plaintiff complained to the defendant of the height of the dam, until after the defendant had built his mill and adjusted his wheels and machinery to the dam, as it then stood. Nor could the plaintiff but suppose that the defendant bought the dam in the belief and confidence, that it then stood at its true height. Nor does there appear to have been any inconvenience to the plaintiff by the overflow complained of, except that of mere land damages of the same nature with the damage done by the flowing, authorised by his deed, up to the West line.

These are the circumstances which surround the plaintiff's claim. Let us look at the condition of the defendant.

He purchased the estate, with the dam standing as it was originally built, and as it had always stood for a period of twelve years. The pond was down ; it is not shown that he knew where the plaintiff's West line was ; he swears in his answer he did not know, and, if he had, he could not know how far the pond would flow. He swears, in his answer, that he bought it in good faith, believing the dam, as it then stood, to be at its true height ; and without any knowledge or suspicion of any complaint, on the part of the plaintiff. This allegation not being responsive to the bill is not evidence for the defendant. But Sweet, defendant's witness, and who repaired the rolling-way for the defendant, states that the defendant directed him to put the new plank of the rolling way at the same height as the old one, saying that he had no right to go any higher.

This shows the views, which the defendant entertained of the true height of the dam. And, indeed, any purchaser, who should buy the dam as it then was, would, unless informed to the contrary, naturally suppose the dam was at the right height, more especially, when it had stood for such a length of time.

And this view is corroborated by the fact, that the defendant has built his mill ; put his wheels and machinery therein, adjusted to the height of the dam, as it was when he bought it. This it is not reasonable to suppose the defendant would have done, had he supposed the dam was liable to be reduced, on complaint made by the plaintiff. The conveyance from Mowry to Aldrich & Wilkinson, which was made a short time before their deed to the defendant, was made with the knowledge of the defendant, and was, no doubt, required by him, before he would purchase the estate.

It is contended by the plaintiff's counsel, that this shows the defendant must have known the dam was too high. But we do not think this by any means follows. The defendant might have supposed the plaintiff's deed to Aldrich & Wilkinson conveyed all his, the plaintiff's, right to flow to his West line, but did not bind the plaintiff to pay damages for the flowage, on the land of others. Besides, the fact that Aldrich & Wilkinson and the defendant were careful to get a deed from Mowry of so small a piece of land, (a few rods,) which was flowed, and made no application to the plaintiff, showed that they supposed the plaintiff was satisfied with the dam, as it then was.

The question is, whether, upon these facts, the plaintiff has made a case for the equitable interposition of this Court by injunction.

Acquiescence in a nuisance by the party injured, has long been held a bar to a bill to restrain the nuisance. In Story's Equity Jurisprudence, (p. 269. Sect. 959,) it is said,—no injunction will be granted to restrain a nuisance by the erection of a building, when the erection has been acquiesced in or encouraged by the party seeking relief. He cites *Williams vs. The Earl of Jersey*, (1 Craig and Phillips 91.) The same doctrine is acted upon in a case reported in Equity Cases Abridged, p. 522-3. A diverted a water course, which put B to great expense, in laying sooths, &c., and, the diversion being a nuisance to B, he brought his action ; but an injunction was decreed upon a bill exhibited for that purpose, it being proved that B did see the work when it was carrying on and connived at it, without shewing the least disagreement, but rather the contrary. *Short vs. Taylor*, in Lord Somers time, was cited, which was ; Short built a fine

house, Taylor began to build another ; but laid part of his foundation upon Short's land ; Short seeing this, did not forbid him, but on the contrary, very much encouraged it, and when the house was built, he brought an action ; and Lord Somers granted an injunction and said, "It was but just and reasonable, for, being a nuisance, every continuance is a fresh nuisance, and so he would be perpetually liable to actions, which would be hard, when he was encouraged by the party himself."

In these cases, the party injured did not bring his bill to restrain the nuisance, but commenced his action at law for damages ; the bill was brought by the defendant in the action at law, to restrain the plaintiff from proceeding in the suit at law, and the injunction was granted on the ground of encouragement and acquiescence in the nuisance, by the party injured.

In *Roper vs. Williams,* (1 Turner & Russell, p. 18,) an injunction to restrain the breach of a covenant, that buildings should be erected on a general plan, was refused ; the covenantee having acquiesced in a partial deviation from the plan and not having made immediate application to the Court. In that case the Lord Chancellor said : " In every case of this sort, the party injured is bound to make immediate application to the Court, in the first instance, and cannot permit money to be expended by a person, even though he has notice of the covenant, and then apply for an injunction."

We think the present case falls within the principles of these decisions.

The grant, by the plaintiff, was a limited grant, and, if he intended to apply for an injunction for exceeding the limits of the grant, he ought to have made his application earlier. The case is stronger against the plain-

Nathan B. Sprague *v.* Anthony Steere.

tiff, than if the parties were strangers, the one committing a nuisance upon the property of the other, without colour of title. And it is stronger in favor of the defendant, from the fact, that he purchased the dam as it then stood, the pond being drawn down, and without any notice from the plaintiff, until after his mills were built, that the dam was too high. After the plaintiff has permitted Aldrich & Wilkinson to occupy this dam, at its present height, for two and a half or three years ; after having himself advertised it for sale, as it then stood and now stands, giving the head and fall as they now are, and permitted the defendant to repair the dam, keeping it at the same height, and erect his mills adjusted to that height, we think it too late for him to apply for an injunction.

The change in the place of the bulkhead, removing it from the dam to some distance down the trench, which conducts the water to the mill, the defendant had a right, under the grant, to make. And the change in the dam consequent upon the change in the place of the bulkhead, we think the defendant had a right to make. We do not think the wings of the dam have been unreasonably extended, or that the dam occupies more land than is necessary for its safety.

Bill to be dismissed without costs.